IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SUSAN A. MARSHALL, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 13-cv-1266-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
|         Defendant. | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Susan A. Marshall seeks judicial review of the final agency decision denying in part her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in October, 2010, alleging disability beginning on March 15, 2009. The alleged date of onset was later amended to November 1, 2008. (Tr. 20). After holding an evidentiary hearing, ALJ Michael Scurry issued a partially favorable decision on August 1, 2012. The ALJ found that Ms. Marshall was not disabled from November 1, 2008, through October 13, 2011, but she became disabled as of October 14, 2011. (Tr. 20-34). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 18.

1

1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.   Plaintiff filed a motion for summary judgment at **Doc. 16.**

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ's credibility determination was erroneous.
2. The ALJ erred in determining RFC.
3. The ALJ's decision was not supported by substantial evidence.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).  "Substantial gainful activity" is work activity that involves doing

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

2

significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be

found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  See also, *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether Ms. Marshall was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).  In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this

Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework described above.  He determined that plaintiff had not worked since the alleged onset date.  He found that plaintiff had severe impairments of fibromyalgia, IgG deficiency, chronic obstructive pulmonary disease, arthralgia, and history of L2 compression fracture treated with kyphoplasty.[3]  He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that, prior to October 14, 2011, Ms. Marshall had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with a number of physical limitations.  Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work.  She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.  As of October 14, 2011, plaintiff's impairments rendered her disabled.

---

[3] Immunoglobulin G, also known as IgG, is the most common type of immunoglobulin (antibody) produced by plasma cells.  It makes up as much as 80% of all the antibodies in the blood.  "When the body doesn't produce enough IgG, the condition is known as an IgG deficiency. People with IgG deficiency are more likely to get infections."  See, http://www.hopkinsmedicine.org/healthlibrary /conditions/allergy_and_asthma/igg_deficiencies_134,109/, accessed on January 8, 2015.

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

1. **Agency Forms**

Plaintiff was born in 1969, and was 39 years old on the alleged onset date. She was insured for DIB through March 31, 2013. (Tr. 168).

Plaintiff worked in the past as a child care provider for her grandchild, a fast-food restaurant cook and a school bus driver. She did some work after the alleged onset date, but it did not rise to the level of substantial gainful activity. (Tr. 172-173, 237). She also worked as a medical secretary. (Tr. 249). She completed two years of college. (Tr. 173).

Plaintiff submitted a Function Report in December, 2010, in which she stated that she did very little on a regular basis. She said that she was unable to sit, stand or walk for long periods. Her hips, legs and feet hurt. Walking and using her arms made her short of breath. She had to take breaks if she did anything. She laid down to rest throughout the day. She did chores like preparing simple meals and washing dishes, but had to take breaks. (Tr. 217-227). In February, 2011, she broke her back and was diagnosed with osteoporosis. (Tr. 243).

2. **Evidentiary Hearing**

Ms. Marshall was represented by an attorney at the evidentiary hearing on July 9, 2012. (Tr. 42).

Plaintiff was 43 years old. She was 5'7" and weighed 115 pounds. She had lost weight in recent months and had no appetite. (Tr. 46-47). Her husband was a self-employed carpenter and farmer. When her children were little, she tried to be a stay-athome mother. When they needed money, she would take a temporary job. When her children were old enough, she took a full-time job at a fast-food restaurant. She went to college for two years to be medical office assistant. She had a temporary job in that field, and then got a job as a Head Start bus driver and classroom assistant. She left that job in March, 2009, because she was having so much pain and fatigue. Her daughter moved in with her after having a baby, and plaintiff babysat for her until about November, 2009. She had to stop taking care of the baby because of fatigue and pain. (Tr. 48-52).

Ms. Marshall testified that she was unable to work because she was fatigued, she had pain in her legs and hips, her feet swelled, she was unable to raise her arms to shoulder level, and she had cramps in her hands. Her doctor told her it was fibromyalgia. It gradually got worse, and, by 2009, it was too difficult for her to work because of the pain and fatigue. She had needed help walking for about six months prior to the hearing, and she used a walker at home. (Tr. 59-61).

During the last four or five months that she worked, she would go straight to bed when she got home. She had a lot of pain and was exhausted. (Tr. 67). Her normal weight was 130 pounds. She had gotten down to 105 pounds. She had pneumonia in 2009. She "fights" bronchitis a lot. She was on antibiotics about half the year. She had difficulty breathing and coughed up a lot of "stuff." (Tr. 70-71).

7

At the time of the hearing, she had "bad days" four or five days out of a week. On a bad day, spent most of the day in bed and did not leave the house or do any household chores. She had gotten worse since November, 2008. Around May, 2009, she was having bad days on two or three days out of a week. (Tr. 71-75).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment for the period prior to October 14, 2011, that is, a person of plaintiff's age and work history who was able to do work at the sedentary exertional level, limited to only occasional climbing of ramps and stairs, balancing, stooping, crouching, kneeling, and crawling, with no climbing of ladders, ropes or scaffolds. She should have no concentrated exposure to wetness, humidity, fumes, odors, dust, hazards, or extreme temperatures. The VE testified that this person could do plaintiff's past work as a medical office clerk. She could also do other jobs in the national and regional economy. Examples of such jobs are receptionist, information clerk and clerical addresser and labeler. (Tr. 78-79).

### 3. Medical Treatment

Plaintiff's primary care physician was Dr. Thomas Heischmidt. The earliest office record is from February, 2008, when she was seen for acute bronchitis and an upper respiratory infection. She had past medical history of fibromyalgia, recurrent chronic migraine and mood disorder. She weighed 135 pounds. (Tr. 579-580). In August, 2008, she complained of weight loss, fatigue and pain all over. She had lost nine pounds since February. Dr. Heischmidt noted muscle spasms in the neck and "multiple trigger points." She was to continue to take

Norco and Flexeril, and to add Trazodone. (Tr. 586-588). She called the office in December, 2008, seeking a refill of Norco due to hip and leg pain. Dr. Heischmidt authorized the refill. (Tr. 596).

Ms. Marshall was seen by Dr. Heischmidt three times in March, 2009, for symptoms related to bronchitis and upper respiratory infection. On March 23, 2009, she had a panic attack in his office and was taken from his office to the hospital, where she was admitted for three days with acute bacterial pneumonia and acute panic episode. The discharge diagnoses included fatigue and fibromyalgia. (Tr. 305-312, 381-382). In August, 2009, she told the doctor that she was losing weight, had no appetite, was fatigued and had mylagias described as "just my regular fibromyalgia." Her weight was down to 107 pounds. Dr. Heischmidt ordered lab work consisting of a general health panel. This was negative. The doctor suggested Kenalog injections to help with "airway issues" and appetite. (Tr. 614-618).

Plaintiff was given Kenalog injections in August and September, 2009. She again had pneumonia. (Tr. 621-624). In October, 2009, she complained of continuing cough, headache, nasal congestion, shortness of breath and poor appetite. Her weight was 105 pounds. Dr. Heischmidt diagnosed COPD with acute bronchitis, upper respiratory infection and rhinitis. (Tr. 630-632). She had similar symptoms in December, 2009, along with fatigue. She weighed 103 pounds. (Tr. 638-640).

In April, 2010, Ms. Marshall complained to Dr. Heischmidt of fatigue, joint pain, diffuse muscle aches, and pain in her legs, hips and spine. Her pain was a 5,

9

but was usually at a level 7. On exam, Dr. Heischmidt noted multiple trigger points on the legs, arms and back. His assessment was fibromyalgia. (Tr. 648-650). She again had multiple trigger points in June, 2010. (Tr. 651-652). She returned in August, 2010, with complaints of worsening fibromyalgia and fatigue. Dr. Heischmidt again found multiple trigger points. She weighed 112 pounds. She was given a trigger point injection. (Tr. 664-665).

Dr. Vittal Chapa performed a consultative physical exam on January 11, 2011. She walked with a limp, favoring the left hip, but she was able to ambulate without any aids. On exam of her lungs, Dr. Chapa detected expiratory wheeze and bilateral rhonchi. He found decreased strength at the left hip due to pain, but motor strength was otherwise normal. There was no paravertebral muscle spasm. Straight leg raising was positive on both sides. She was unable to walk on heels or toes or to squat and arise. The range of motion of the left hip was limited due to pain. Lumbosacral spine flexion was normal. Handgrip was full bilaterally and she was able to perform both fine and gross manipulations with both hands. (Tr. 445-457).

Plaintiff suffered a compression fracture at L2 in February, 2011. She was initially treated with a brace. (Tr. 774-776). She was treated by Dr. Gabriel at Bonutti Orthopedic Services. On February 23, 2011, in addition to symptoms related to her fracture, Dr. Gabriel noted that she had "some general ache to her leg with a history of fibromyalgia." (Tr. 550-558).

Dr. Heischmidt again found multiple trigger points in February and March. (Tr. 677-678, 683-684).

10

In May, 2011, Dr. Heischmidt performed a pre-operative exam. Plaintiff was using a motorized scooter because of severe weakness in her legs. She had pain at the site of her back fracture. On exam, she had tenderness over the SI joint and the low back. She had no muscle spasms and a full range of motion. (Tr. 690-693). Dr. Gabriel performed kyphoplasty at L2 in May, 2011. By June 6, 2011, he noted that she was feeling better and was to begin a home exercise program. (Tr. 566-568).

Dr. Heischmidt again noted multiple trigger points in August, 2011. (Tr. 701-702). He saw plaintiff in September, 2011, for symptoms related to acute bronchitis and upper respiratory infection. Her weight was 129 pounds. (Tr. 704-705).

On referral from Dr. Heischmidt, Ms. Marshall saw Dr. Mark Stern for evaluation of her fibromyalgia on October 14, 2011. Dr. Stern noted that she had been diagnosed with fibromyalgia six years earlier. Her weight was 129.25 pounds. On exam, "Soft tissue pain is note[d] diffusely as well as typical fibromyalgia." He ordered lab work, changed her medications, and suggested that she consider bilateral hip injections. (Tr. 781-783). At the next visit with Dr. Stern, he noted that she had "a history for hypogammaglobulinemia with an IgG level of 0.4. The patient has had a history for bronchitis, usually 1 or 2 times per year, and pneumonia, usually once per year, which would explain the features of her infections based on the hypogammaglobulinemia." (Tr. 786).

## Analysis

The Seventh Circuit has "repeatedly held that although an ALJ does not need

to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). This rule is long-standing. See, *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), and cases cited therein.

The ALJ's discussion of the medical evidence in this case misconstrues the record and omits reference to evidence favorable to the plaintiff. As a result, both the credibility determination and RFC assessment are faulty.

ALJ Scurry concluded that plaintiff's allegations about her symptoms are not credible "prior to October 14, 2011, to the extent they are inconsistent with the residual functional capacity assessment." (Tr. 26). However, "beginning on October 14, 2011, the claimant's allegations regarding her symptoms and limitations are generally credible." (Tr. 30). He concluded that she was disabled as of October 14, 2011, the date on which she first saw Dr. Stern.

The ALJ used the boilerplate language that has often been criticized by the Seventh Circuit. See, *Minnick v. Colvin,* --- F.3d ----, 2015 WL 75273, *6 (7th Cir., January 7, 2015); *Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010). The use of the boilerplate language does not automatically require reversal, however. It is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence. *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir 2012). The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the

plaintiff's testimony; the ALJ must analyze the evidence. *Ibid*. If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

The ALJ concluded that Ms. Marshall's "subjective complaints from fibromyalgia" were not credible because she had "normal physical exams." (Tr. 28). This conclusion reflects both a misunderstanding of the disease and of the medical records.

The Seventh Circuit has described fibromyalgia ("a common, but elusive and mysterious, disease)" as follows:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).

The ALJ overlooked or misinterpreted the many entries in Dr. Heischmidt's records documenting the presence of "multiple trigger points" prior to October 14, 2011. In addition, he referred to the exam of June, 2010, as normal (Tr. 26), but Dr. Heischmidt documented the presence of multiple trigger points on that visit, Tr. 651-652. He acknowledged that she had multiple trigger points in August, 2011, but also said that her "clinical exams remained normal." (Tr. 26). Simply put, a finding of multiple trigger points in a fibromyalgia patient is the opposite of a

13

normal exam. In addition, the ALJ stated that she received "only routine and conservative care," but there is no medical evidence to indicate that any other kind of treatment is available for fibromyalgia. An ALJ may not "play doctor." *Myles v. Astrue*, 582 F.3d 672, 677-678 (7th Cir. 2009). In the absence of any medical evidence that something other than routine and conservative care is available, the ALJ erred in discounting the severity of her fibromyalgia on that basis.

The ALJ also apparently misunderstood the effect of plaintiff's IgG deficiency. The medical records reflect that she suffered from recurrent infections such as pneumonia and bronchitis. According to Dr. Stern, her recurrent infections were explained by her IgG deficiency. However, the ALJ chalked them up to COPD, and said that she had no specific treatment for IgG or limitations from that condition. His failure to appreciate that IgG deficiency leaves her vulnerable to infections, including recurrent bouts of pneumonia and bronchitis, and to consider the effect of those recurring infections in combination with her other limitations on her ability to work full-time, was error. See, *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014), emphasizing that "the *combined* effects of the applicant's impairments must be considered, including impairments that considered one by one are not disabling." (emphasis in original).

Further, some of the reasons given by the ALJ for disbelieving Ms. Marshall as to her condition before October 14, 2011, do not make sense. He said that a doctor's notes indicated that her pain was "beyond what would be expected with fibromyalgia," citing Ex. 15F/1. See, Tr. 28. However, Ex. 15F/1 is a record of a visit with Dr. Stern on February 12, 2012. (Tr. 790). ALJ Scurry concluded that

14

she was already disabled as of that date. It is entirely unclear how Dr. Stern's note supports his credibility analysis as to the period before October 14, 2011. Similarly, the meaning of the ALJ's statement that he "particularly stress [sic] the doctor's notes that the claimant's COPD exacerbation was typical for the disease" is difficult to discern. "Though an ALJ's credibility determination may only be overturned if it is 'patently wrong,' . . . a failure to adequately explain his or her credibility finding by discussing specific reasons supported by the record is grounds for reversal." *Minnick*, 2015 WL 75273 at *7.

Plaintiff also points out that there is little in the ALJ's decision to justify designating October 14, 2011, as the date of onset of disability. No traumatic injury or accident occurred on that date. Rather, that is the date of plaintiff's first visit with Dr. Stern. The ALJ's mischaracterization of Dr. Heischmidt's records undermines the ALJ's evident conclusion that Ms. Marshall's fibromyalgia dramatically worsened around the time that Dr. Stern first saw her.

The Commissioner's defense of this case is perfunctory. She argues that the evidence cited by plaintiff does not show that she has limitations more severe than those assessed by the ALJ. Doc. 26, p. 11-12. This argument misses the mark. The ALJ's highly selective review of the medical evidence undermines his findings as to plaintiff's credibility and his ultimate findings as to plaintiff's RFC. See, *Moore*, 743 F.3d at 1122-1127. The Commissioner completely fails to grapple with the fact that the ALJ characterized Dr. Heischmidt's exams as normal when the doctor documented multiple trigger points. The ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion.

*Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).  While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."  *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

The ALJ is required to build a logical bridge from the evidence to his conclusions."  *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).  ALJ Scurry simply failed to do so here.  As in *Moore*, he erred in presenting only a "skewed version of the evidence."  *Moore*, 743 F.3d at 1123.  As a result, his decision is lacking in evidentiary support and must be remanded.  *Minnick*, 2015 WL 75273 at *7; *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Marshall was disabled before October 14, 2011, or that she should be awarded benefits for the period in question.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.[4]

## Conclusion

Plaintiff's motion for summary judgment **(Doc. 16)** is **GRANTED**.

The Commissioner's final decision denying Susan A. Marshall's application for social security disability benefits for the period from November 1, 2008, through October 13, 2011, is **REVERSED** and **REMANDED** to the Commissioner

---

[4] The Commissioner may wish to consider consulting a medical expert pursuant to 20 C.F.R. §404.1527(e).

16

for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   January 8, 2015.**

<u>s/ Clifford J. Proud</u><br>
**CLIFFORD J. PROUD**<br>
**UNITED STATES MAGISTRATE JUDGE**